**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| **JON K. RIVERS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )      **3:13-cv-00066-PPS** |
| | ) |
| **CAROLYN COLVIN,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## OPINION AND ORDER

Claimant Jon K. Rivers seeks review of the final administrative decision of the

Commissioner of Social Security to deny his application for disability insurance benefits. Rivers

has a history of cognitive difficulties, anxiety, and depression which he alleges stems from a

concussion he sustained when a beam fell on him during his time in the military in the 1970s. He

applied for disability benefits in 2009, alleging disability beginning December 15, 2008. After a

hearing, the Administrative Law Judge denied Rivers's claim. On appeal, Rivers claims that the

ALJ erred in several respects. I disagree that the ALJ's decision was deficient, especially not to

the degree required for reversal under the deferential standard of review I must apply here.

Therefore, because I find that the ALJ's decision was supported by substantial evidence as

discussed below, I **AFFIRM** it.

## BACKGROUND

Rivers is in his late fifties and has earned an associates degree in electronics. [Record at

266.] During the fifteen years before filing his disability claim, Rivers held jobs as a welder,

security guard and production lapping worker. [R. at 205, 211.] He claims to have been fired

from "probably fifty jobs or more," attributing his inability to hold a job to psychiatric issues. [R.

at 204, 320.] While the record does not confirm the loss of fifty or more jobs, it does say that Rivers was fired from his job as a security guard in December 2008 after falling asleep in his car, which he claims was due to a medication he was taking. [R. at 204, 320.] This is the same month Rivers listed as his disability onset date. [R. at 166.] However, it wasn't until approximately two months later, in February 2009, that Rivers claims he stopped working after being "involuntarily laid off," presumably from a different job.[1] [R. at 204.]

Rivers contends that his psychiatric problems stem from an accident which occurred during his time in the army. Rivers was in the Army Engineering Unit from May of 1974 until he was honorably discharged in May of 1977. [R. at 49.] Rivers suffered a concussion in either 1974 or 1975, after a metal beam hit him in the head. [R. at 204, 227, 321, 372.] Rivers contends that he has suffered from memory difficulties, post-traumatic stress disorder and high anxiety since that time. [R. at 352, 371-72.]

While Rivers has never been hospitalized due to psychiatric problems, he was treated by an outpatient mental health counselor/therapist and saw a psychiatrist throughout 1991. [R. at 320.] Additionally, over the years Rivers has been prescribed a variety of medications to treat his psychiatric issues, which include post-traumatic stress disorder and depression. [R. at 276.] He reports he was prescribed Desyrel in 1985, and then Prozac in the 1990s. [*Id.*] Rivers was first prescribed Zoloft in 1995, and he took that for 12 years. [R. at 321.]

In January 2008 Rivers saw a clinical social worker and complained of "bad depression" and a "new memory problem." He was given a refill for Zoloft, and was referred for a psychiatric evaluation. [R. at 308-10.] A year later, in March 2009, Rivers called the VA

---

[1] The record also contains information that Rivers was fired in December 2009 from a job at Caterpillar for charges of intimidation of other staff. [R. at 372.] However, it is unclear whether this is a mistake, as this seems to conflict with other information in the record, and at the hearing Rivers indicated he was actually fired for intimidation in November 2006. [R. at 55.]

complaining of trembling in his hands. [R. at 305.] That same month, Rivers had a primary care consultation, and his examining physician questioned whether his trembling was caused by energy supplements or another recreational drug. [R. at 299-300.] A drug test ruled out recreational drug use. [R. at 316.] A few months later, in July, Rivers reported that his hand tremor had stopped after discontinuing use of an energy supplement. [R. at 289.] Shortly after this, on August 12, 2009, Rivers filed his original application for Social Security benefits. This claim was ultimately denied. [R. at 266.]

In November 2009 Rivers saw Dr. Pate for a consultative psychological examination regarding his pending claim. [R. at 320-23.] Rivers complained of trouble concentrating, reported hearing voices in his head, and said that he thinks about suicide every day. [R. at 320, 322.] Dr. Pate diagnosed dysthymia, ruled out a personality disorder, and assessed a Global Assessment of Functioning (GAF) score of 60. [R. at 323.] A month later, Dr. Johnson, a psychological consultant for the Disability Determination Bureau, performed a Psychiatric Review Technique evaluation and concluded that Rivers suffered from an impairment under Listing 12.04 (affective disorders), but suffered only mild or moderate limitations as a result of his dysthymia. [R. at 327-44.] At that time, Dr. Johnson also assigned Rivers a GAF score of 60. [R. at 343.]

In January 2010, Rivers went to the VA complaining of memory problems, anxiety, and personality changes. [R. at 352.] While at the VA, Rivers met with Dr. Lydon for a psychiatric evaluation. [R. at 371.] Dr. Lydon administered a Montreal Cognitive Assessment (MOCA), recording a score of 22/30. [R. at 372.] Dr. Lydon diagnosed Rivers with a cognitive disorder and an anxiety disorder and depression, and assessed a GAF score of 45. [R. at 374.] Dr. Lydon explained that Rivers would "benefit from a comprehensive neuropsychological evaluation to

determine extent of psychiatric and cognitive difficulty." [*Id.*] That same month Rivers filed his reconsideration for Social Security benefits, which was denied. [R. at 266.] Following this second denial, in May 2010 Rivers requested a hearing before an ALJ. [*Id.*]

Approximately six months after requesting a hearing, in November 2010, Rivers went to the VA Hospital emergency room complaining of having taken too much of his medication. [R. at 382.] Dr. Goodman examined Rivers and noted that the majority of Rivers's problems have historically been psychiatric. [*Id.*] Dr. Goodman recorded a past medical history of paranoia, depression, and cognitive impairment, but does not appear to have done any new or independent assessment of Rivers's psychological state. Dr. Goodman admitted Rivers to the Indiana Veteran's Home due to an "inability to care for himself and having some increasing difficulty in walking." [*Id.*] In February of 2011, Dr. Goodman completed a Medical Provider Questionnaire for Listings 12.04 and 12.06, concluding that Rivers met the requirements for listing 12.06 (anxiety-related disorders), but was unable to determine if he met listing 12.04 (affective disorders). [R. at 385-93.] Additionally, shortly after his admission to the Veteran's Home but before his administrative hearing, in December 2010, Rivers's medical records indicate (with almost no explanation) that he was diagnosed with paranoia and dementia. [R. at 437.]

In July 2011 Rivers appeared, represented by counsel, for his hearing before the ALJ. Medical experts Dr. Lee Fischer and Dr. Don Olive appeared at the hearing, as well as Vocational Expert Michael Blankenship. [R. at 43-101.] At the hearing Rivers testified that he had been living in a Veterans Home for the past seven months, and was no longer driving due to concentration problems. [R. at 47, 49-50.] He also testified that, despite holding "a small, menial job" at the Veterans home pushing nonambulatory patients to physical therapy, he was unable to work because of memory and concentration problems. [R. at 50, 65, 94.] Dr. Olive testified that

Rivers had been admitted to the Veterans home "predominantly for physical reasons," and felt that Rivers would be capable of simple, repetitive tasks or unskilled work with no strict deadlines or production quotas and only occasional contact with other people. [R. at 90-93.] Finally, vocational expert Mr. Blankenship testified that a hypothetical individual of Rivers age, education and work experience, with no physical limitations but with the designated mental limitations, could perform the following "medium," unskilled positions: hospital cleaner, hand packager, and stores laborer. [R. at 95, 98-99.] Rivers's attorney asked if there were any job for an individual who is unable to stay on task for one third of the workday, and Mr. Blankenship answered that he was not aware of any such job. [R. at 99.]

The ALJ issued a decision denying Rivers benefits in August 2011. [R. at 24-38.] The ALJ employed the five-step analysis standard in disability benefits cases. At step one, the ALJ confirmed that Rivers had not engaged in substantial gainful activity since his application date. [R. at 26.] At step two, the ALJ concluded that Rivers suffered from the following severe impairments: cognitive disorder, depression, and anxiety. [*Id.*] At step three, the ALJ determined that Rivers did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. [R. at 27-29; 20 C.F.R. Part 404, Subpart P, Appendix 1.] After considering the entire record, the ALJ found that Rivers had the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: work limited to simple and repetitive tasks, commensurate with unskilled work; work limited to no more than occasional contact with the general public, co-workers, and supervisors; and work that does not require fast paced production standards. [R. at 29-36.] At step four, the ALJ found that Rivers was unable to perform any of his past relevant

jobs. [R. at 36.] However, at step five the ALJ found that there were a significant number of jobs in the national economy that Rivers could perform. [R. at 36-37.]

The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. [R. at 4-8.] Rivers timely sought review of that decision by filing this case.

## DISCUSSION

My review of an ALJ's decision to deny Social Security benefits is limited to determining whether the decision is supported by substantial evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). "Evidence is substantial if it is sufficient for a reasonable person to accept as adequate to support the decision." *Id.* (internal quotation marks and citations omitted). In other words, the ALJ's decision, if supported by substantial evidence and reached under the correct legal standard, will be upheld even if reasonable minds could differ as to the appropriate conclusion. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). It is not my job to re-weigh evidence, choose among conflicting versions of events, decide questions of credibility, or substitute my own judgment for the ALJ's. *Jens*, 347 F.3d at 212.

To receive disability benefits under the Social Security Act, a claimant must be "disabled" as defined by the Act at 42 U.S.C. § 423(d). 42 U.S.C. § 423(a)(1)(E). A claimant qualifies as disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, a claimant's physical or mental impairment or impairments must be of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

Rivers objects to the ALJ's decision based on the analysis under the anxiety disorder listing, the ALJ's decision to afford little weight to Dr. Goodman's medical opinion, the ALJ's failure to discuss Rivers's back injury, and the ALJ's assessment of Rivers's ability to work. Rivers argues that these failures ultimately led to a faulty assessment of the jobs that Rivers can perform. [DE 24 at 2.]

Rivers argues that the ALJ's analysis of Rivers's anxiety disorder with respect to Listing 12.06 (anxiety-related disorders) was perfunctory and erroneous because the ALJ simply wrote that "with regards to Listing 12.06, the medical evidence does not show the claimant's complete inability to function independently outside the area of his home." [R. at 29.] Rivers then goes on to list a series of places in the record that he claims demonstrate that his mental impairments met or equaled 12.06, and then criticizes the ALJ's reliance on other medical opinions to conclude that Rivers's mental impairment did not meet or equal Listing 12.06. [DE 24 at 16-20.] However, I believe that the ALJ's analysis of Listing 12.06 was neither perfunctory nor erroneous. Rivers is essentially asking me to reassess the evidence in the record and overrule the ALJ's determinations of the credibility of medical opinions, but I can't do either of those things. And while it is true that the ALJ initially only briefly stated that Rivers was not unable to function outside his home, he later explained that finding in great detail. [R. at 32-34.]

Under 12.06, Rivers had to show that he suffered from certain symptoms *and* that, as a result, he suffered from *marked* limitations in certain areas of daily living *or* he was completely unable to function independently outside of his home. The ALJ thoroughly considered all of the medical opinions in the record and found that Rivers suffered from no more than moderate difficulties in the relevant areas of functionality, which means Rivers's impairment didn't rise to the "marked" level. [R. at 27-28.] The ALJ's findings comport with the state psychiatric

evaluations in the record, and with the testimony of the doctor who reviewed the record and testified at the hearing. [R. at 84-88, 320-26, 341-42.]

The heart of Rivers's objection is to the ALJ's decision that Rivers did not show a complete inability to function outside his home. Rivers points to his admission to the Veteran's Home by Dr. Goodman on the stated basis that Rivers was unable "to care for himself and having some increasing difficulty in walking." [R. at 442.] Dr. Goodman also noted that "the majority of [Rivers's] problems have been psychiatric." [R. at 442.] The ALJ's opinion indicates that he reviewed and considered Dr. Goodman's opinion, but that he gave it little weight, instead affording more weight to the medical opinion of the testifying Dr. Olive because the ALJ found that "opinion persuasive and consistent with the medical evidence of record." [R. at 33.]

A treating physician's opinion receives controlling weight only "if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford v. Apfel*, 227 F.3d. 863, 870 (7th Cir. 2000). "But once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight and becomes just one more piece of evidence for the ALJ to consider." *Bates v. Colvin*, 736 F.3d 1093, 1099-1100 (7th Cir. 2013) (internal quotation marks and citation omitted). Moreover, "[a]n ALJ is not required to accept a doctor's opinion if it is brief, conclusory, and inadequately supported by clinical findings." *Gildon v. Astrue*, 260 Fed. Appx. 927, 929 (7th Cir. 2008) (citations and quotation marks omitted).

The ALJ was well within his purview in giving substantial weight to the psychiatric evidence in the record and Dr. Olive's testimony, and in giving little weight to Dr. Goodman's evaluation, which decisions the ALJ fully explained in his opinion. First, although Dr. Goodman evaluated Rivers for admission to the Veteran's Home, their relationship is unclear, and there is

no indication that it had the length and regularity that typically justifies affording great weight to the treating doctor's opinion. *See Jacoby v. Barnhart*, 93 Fed. Appx. 939, 942 (7th Cir. 2004). Second, and relatedly, Dr. Goodman's records related to Rivers are conclusory, sparse, and inconsistent. Finally, also relatedly, the ALJ found Dr. Goodman's opinion unsupported in the record. [R. at 34.]

Rivers also argued that the ALJ didn't build a logical bridge between the evidence and his finding that Rivers is able to do certain kinds of work. Rivers's argument was again based on Dr. Goodman's findings that Rivers couldn't function outside the home, as well as Rivers's own testimony that he had been unable to keep a job. [DE 24 at 20-25.] The ALJ was justified in largely discounting Dr. Goodman's unsupported and unexplained opinion for the same reasons discussed previously. Furthermore, to the extent that Dr. Goodman's opinion was that Rivers couldn't work (because he couldn't function outside the home), that goes beyond a doctor's bailiwick and into the ALJ's. A claimant is not entitled to benefits just because a physician finds him "disabled" or "unable to work" or even eligible for benefits under some standard other than the Social Security Act. *Gildon*, 260 Fed. Appx. at 929. Here, that opinion is even more tenuous because it is unclear from the record what criteria Dr. Goodman applied in finding Rivers unable to care for himself such that Rivers was admitted to the Veteran's Home. *See Clifford*, 227 F.3d at 874 ("[T]he ALJ is not bound by findings made by either a governmental or nongovernmental agency concerning whether the claimant is disabled. *See* 20 C.F.R. § 416.904. . . . [T]he ALJ must independently determine if a claimant is 'disabled' as defined solely in the Social Security Act.").

As for Rivers's testimony, the ALJ considered and evaluated it. Rivers argues that the ALJ "erred by improperly dismissing the claimant's allegations that he could not sustain the

mental demands of work activity." [DE 24 at 24.] This argument fails for a few reasons. A claimant can testify to facts, but, as with a doctor's opinion, the ALJ doesn't need to accept the claimant's own opinion about his ability to work – if the ALJ did have to accept the claimant's own evaluation of his capacity for work, the whole disability insurance claim process would be pointless. The facts that Rivers testified to support the ALJ's finding that Rivers has the capacity for some limited work: Rivers regularly runs, lifts weights, reads, watches television, and, notably, works as a patient transporter in the Veteran's Home. [R. at 34.] With respect to mental limitations, the ALJ assessed Rivers's testimony and credibility along with the record and the testimony of the other witnesses, and then came to reasoned conclusions in his opinion.

Rivers's own testimony also scuttles his argument that the ALJ's decision is deficient because it doesn't discuss Rivers's back issues. There is a radiology report buried in the record indicating degenerative disease in Rivers's spine, although there was "no acute abnormality." [R. at 397.] However, no doctor, not even Dr. Goodman, expressed the opinion that the back issues restricted Rivers's ability to work. In fact, Rivers "testified that he could stand for several hours, walk a couple of miles, and sit for two to four hours at a time. He further indicated that he could lift and carry up to approximately twenty-five pounds, but acknowledged that he had no formal weight restrictions placed on him by a physician." [R. at 35, 59-60, 64.] While the ALJ did not specifically ask about Rivers's back, he asked about all of the activities that would evidence a limiting back injury, and adequately addressed Rivers's physical abilities in his opinion. *See Outlaw v. Astrue*, 412 Fed. Appx. 894, 897 (7th Cir. 2011) ("An ALJ need not discuss every piece of evidence, but must logically connect the evidence to the ALJ's conclusions . . . .").

Finally, the ALJ factored in Rivers's mental conditions in restricting his RFC to unskilled work and only minimal interaction with the public. Specifically, the ALJ found that Rivers's

abilities limited him to unskilled work involving "no more than occasional contact with the public, co-workers, and supervisors," and not "requiring fast paced production standards." [R. at 36.] Rivers's mild to moderate limitations do not necessarily result in a complete inability to work – that's the point of the latter steps of the disability benefits analysis, which analyze the ability to work even with a disability. The ALJ's findings regarding residual ability to work are reasonable given Rivers's medical history and track the opinions of the doctors who testified at the hearing. [R. At 82-92.] *See Outlaw*, 412 Fed. Appx. at 897 (finding that limiting the claimant's RFC to include only unskilled work, with no public contact, did provide reasonable accommodations for the claimant's mental limitations).

The ALJ considered all of the evidence in the record and the testimony at the hearing, and came to reasoned conclusions supported by substantial evidence. It is a rare case that doesn't present some conflicting evidence, and it is the ALJ's job to evaluate the conflicting evidence, to assign appropriate weight to the various pieces, and to come to a decision based on a comprehensive analysis. The ALJ did that here, and so I affirm his decision.

## CONCLUSION

The ALJ provided legitimate and reasoned bases for his opinion. While reasonable minds could differ on the outcome, the only issue here is whether the ALJ's conclusion was supported by substantial evidence, and it was. Accordingly, the decision of the ALJ is **AFFIRMED**.

**SO ORDERED**.

ENTERED: March 31, 2014          /s/ Philip P. Simon
                                 **PHILIP P. SIMON, CHIEF JUDGE**
                                 **UNITED STATES DISTRICT COURT**